**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN LAGORE,** | ) | **CASE NO. 4:12CV2626** |
| | ) | |
| **Plaintiff,** | ) | **MAGISTRATE JUDGE** |
| | ) | **GEORGE J. LIMBERT** |
| **v.** | ) | |
| | ) | |
| **CAROLYN W. COLVIN[1],** | ) | **MEMORANDUM OPINION & ORDER** |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

        John Lagore ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin

("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying his

applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

ECF Dkt. #1. For the following reasons, the Court AFFIRMS the ALJ's decision and DISMISSES

Plaintiff's complaint in its entirety with prejudice:

**I.        PROCEDURAL AND FACTUAL HISTORY**

        On August 5, 2009, Plaintiff protectively filed for DIB and SSI, alleging disability beginning

November 1, 2006 due to being a "slow learner" and having "anger management" issues. ECF Dkt.

#13 ("Tr.") at 122-131, 140-141[2]. The SSA denied Plaintiff's applications initially and on

reconsideration. *Id*. at 66-71. Plaintiff requested an administrative hearing, which was held on April

28, 2011. *Id*. at 28, 91-92. At the hearing, the ALJ accepted the testimony of Plaintiff, who was

represented by counsel, and a vocational expert ("VE"). *Id.* On May 17, 2011, the ALJ issued a

---

        [1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security,
replacing Michael J. Astrue.

        [2]References to the administrative record in this case refer to the ECF docket number of the cited
document and the page number assigned to cited pleading by the ECF system, which can be found in the
search box at the top of the page on the ECF toolbar.

decision denying benefits. *Id*. at 13-23.  Plaintiff filed a request for review, which the Appeals Council denied on November 26, 2012. *Id*. at 1-8.

On October 19, 2012, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1.  On April 11, 2013, with leave of the Court, Plaintiff filed a brief on the merits.  ECF Dkt. #18. On May 23, 2013, Defendant filed a brief on the merits.  ECF Dkt. #19.  A reply brief was filed on June 14, 2013. ECF Dkt. #23.

II.    **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was twenty-seven years old at the time he alleged he became disabled and thirty-two years old at the time of the ALJ's decision, suffered from depressive disorder not otherwise specified, dysthymic disorder, borderline intellectual functioning ("BIF"), and a personality disorder, which qualified as severe impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c). Tr. at 15.  The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings").  *Id*. at 15-16.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following limitations: he is limited to tasks that are simple, routine and repetitive which can be learned within thirty days or less; low stress tasks, defined as preclusive of high production quotas, such as piecework or assembly line work, strict time requirements, arbitration, negotiation, confrontation, directing the work of or being responsible for the safety of others; no jobs requiring reading or writing; no jobs requiring more than limited and superficial interaction with supervisors, co-workers and the general public; and no jobs requiring team work or group projects.  Tr. at 18.

With this RFC and based upon the VE's testimony, the ALJ ultimately concluded that Plaintiff could perform his past relevant work as a woodcutter.  Tr. at 21.  The ALJ also found that Plaintiff was capable of performing other jobs existing in significant numbers in the national economy, including the representative occupations of dining room attendant, laundry worker, and cook helper.  *Id*. at 22-23.  As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.  *Id*. at 23.

**III.**   **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to

benefits.  These steps are:

1.   An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.   An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.   If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.   If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward

with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon*

*v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**IV.**   **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and

makes a determination of disability.  This Court's review of such a determination is limited in scope

by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Therefore, this

Court's scope of review is limited to determining whether substantial evidence supports the findings

of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v.*

*Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

**V.     MEDICAL AND TESTIMONIAL EVIDENCE**

**A.     MEDICAL EVIDENCE**

On March 13, 2008, Plaintiff presented to Turning Point Counseling for a diagnostic assessment. Tr. at 201-213. A licensed social worker diagnosed Plaintiff with depressive disorder not otherwise specified and personality disorder not otherwise specified. *Id*. at 202. Plaintiff explained at the evaluation that he had been depressed for years and had a history of domestic violence charges. *Id.* at 203. He stated that he had been taking anger management classes but felt that anger was still an issue for him. *Id.* at 203. He related a suicide attempt six years prior and indicated that he had a vague plan for doing so. *Id*. He reported that he isolated himself, had no energy or motivation, and felt numb and sad all day. *Id*. at 208. He also reported auditory and visual hallucinations. *Id.* at 209. Plaintiff stated that he liked cars and working around wood, he had one friend that he seldom visited, and he described himself as a "slow learner" as he could not read, could not fill out job applications or take tests for jobs, and he had trouble completing tasks or learning new jobs. *Id*. at 204-205.

An additional report from this initial assessment indicated diagnoses of moderate major depressive disorder, single episode with psychotic features, rule out reading disorder, and intermittent explosive disorder. Tr. at 212. Treatment recommendations included medication and counseling. *Id.* at 213. His current GAF was rated as a 50, indicating serious symptoms. *Id*. at 212.

On May 14, 2008, notes from Dr. Guttikonda at Turning Point indicate that Plaintiff came in for an evaluation and his symptoms of depression were vague at best.  Tr. at 217.  Plaintiff related that if he had a car, he would commit suicide.  *Id*.  He appeared to Dr. Guttikonda to be cognitively and socially impaired and he was diagnosed with depressive disorder not otherwise specified and dysthymic disorder not otherwise specified.  *Id.*  His GAF was assessed at 68, indicating moderate symptoms and medicine management and individual counseling were recommended.  *Id.*

On April 30, 2009, Plaintiff presented to the emergency room complaining of headaches off and on for the past one and a half weeks.  Tr. at 311.  He was diagnosed with a headache and prescribed Motrin 600 mg.  *Id.* at 313-314.

On November 12, 2009, Dr. Palumbo, Ph.D., evaluated Plaintiff at the request of the agency. Tr. at 224.  Dr. Palumbo noted that Plaintiff mentioned that he was unemployed and was in danger of losing his driver's license because of his failure to pay child support.  *Id*.  He related that he worked at his last job at a saw mill for four years until he was laid off because business was poor. *Id.* He had a few temporary jobs but was not called back or was let go due to poor work performance because he was slow.  *Id*.  He indicated that his anger and difficulty being around other people made it hard for him to work.  *Id.*  Dr. Palumbo noted that he had no records to review from Plaintiff's mental health center for which he had been treating for the past year and a half.  *Id*. at 225.

Plaintiff described his prior assault and domestic violence charges, explaining that one involved him kicking out the window of a police car during one incident, and another involved his sister. Tr. at 225.  Dr. Palumbo noted that Plaintiff had adequate personal hygiene, he was alert and oriented, his speech was clear and of normal pace and volume.  *Id*. He described Plaintiff's mood as serious, with appropriate affect, direct eye contact and no nervous movement or hallucinations.  *Id*. at 225-226.  Plaintiff reported that his appetite and sleep were fair, and he had fleeting suicidal ideation with occasional feelings of worthlessness, helplessness and hopelessness because he was not working.  *Id.* at 226.  Plaintiff indicated that he felt irritated at home and he denied any anxiety upon leaving the house and denied auditory or visual hallucinations.  *Id.* Plaintiff related that he had an eight year-old daughter who lived nearby and he spent time with her.  *Id.*

Dr. Palumbo further reported that Plaintiff had fair memory and recall, concentration and attention, but when given three items to remember, he could recall one immediately and could recall none of the three after five minutes. Tr. at 226. Plaintiff could not perform serial seven subtractions, he did not know the current president, and he declined to interpret sayings and "made little effort to do simple mental tests." *Id*. at 227.

Dr. Palumbo diagnosed Plaintiff with dysthymic disorder, personality disorder not otherwise specified, and BIF and concluded that due to his irritability, depressed mood, moderate anhedonia and feelings of worthlessness, and BIF, Plaintiff had moderate impairment in his abilities to understand and follow directions, relate to fellow employees, supervisors and the public, maintaining attention and performing simple repetitive tasks, and in withstanding the stress and pressures associated with daily work activity. Tr. at 227-228.

October 13, 2009 notes from Turning Point show that Plaintiff reported that he was doing nothing except "moping around" and he reported that he was denied social security benefits. Tr. at 276. Plaintiff's thought process was found logical, he reported getting along with his girlfriend, he denied hallucinations, and his insight and judgment were assessed as poor. *Id.*

On November 23, 2009, Dr. Meyer, Ph.D. completed a psychiatric review technique form and mental RFC form upon review of Plaintiff's record. Tr. at 229-246. He concluded that Plaintiff's mental impairments caused no significant limitation in his abilities to: remember locations and work-like procedures, understand, remember and carry out very short and simple instructions; carry out detailed instructions; make simple work-related decisions; to ask simple questions or request assistance; and to be aware of normal hazrds and take appropriate precautions. *Id*. at 229-230. He opined that Plaintiff was moderately limited in the abilities to: understand and remember detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-

-6-

workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  *Id.*

On the psychiatric review technique form, Dr. Meyer indicated that Plaintiff's dysthymic disorder, BIF, and personality disorder not otherwise specified caused mild restrictions in his activities of daily living, and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace.  Tr. at 236-243.

Turning Point counseling notes on January 6, 2010 indicated that Plaintiff lost his driver's license as a result of non-payment of child support..  Tr. at 272.  Plaintiff reported that he was not doing anything and not even looking for a job.  *Id*.  His thought process was logical, his mood was stable and his affect was constricted.  *Id.*  Plaintiff's insight and judgment were assessed as poor. *Id.* at 274-275.

On January 17, 2010, Plaintiff presented to the emergency room complaining of headaches on and off over the past few months.  Tr. at 299, 302.  He was diagnosed with nonspecific cephalgia after a CT scan of his brain showed normal results.  *Id*. at 304-306.

On January 25, 2010, Plaintiff followed up with an internist following his emergency room visit.  Tr. at 322.  He reported that he still had a dull headache.  *Id*. Physical examination revealed normal results, although Plaintiff complained of nasal congestion and depression.  *Id*. at 320-321. It was noted that a CT scan showed that he had prominent opacified bilateral maxillary sinuses.  *Id*. Treatment was Excedrin Sinus Headache medicine one every eight hours as needed.  *Id*.

On March 26, 2010, Dr. Tangeman, Ph.D., affirmed the November 23, 2009 findings of Dr. Meyer.  Tr. at 324.  He indicated that he had reviewed Dr. Meyer's findings and he found that Plaintiff's condition had not worsened since that time and he cited to a January 6, 2010 mental status examination in which Plaintiff had logical thought process, constricted affect, stable mood and poor insight and judgment.  *Id*.  He found that Plaintiff's condition had not significantly changed since the November 23, 2009 assessment and therefore affirmed those findings.  *Id.*

On March 31, 2010, notes from Turning Point indicated that Plaintiff was hearing voices three to six times per week.  Tr. at 335.  His thought process was found to be logical, and his mood

was found stable with a blunted affect. *Id*. His insight and judgment were poor. *Id*. As to additional diagnoses, mild mental retardation on Axis II was noted. *Id*. at 336.

June 23, 2010 notes from Turning Point indicate that Plaintiff was doing nothing except sitting around and watching television. Tr. at 333. He was being supported by his stepfather and no history of psychosis was reported. *Id*. Plaintiff's thought process was logical, he denied hallucinations, his cognition was found impaired, and his insight and judgment were poor. *Id*. A notation was made to rule out schizo-affective disorder, depressive type. *Id*. at 334.

Turning Point notes from September 15, 2010 indicate that Plaintiff was not doing anything and he reported no other concerns except for the court hearing on his social security benefits. Tr. at 331. He was found to have a logical thought process, he denied hallucinations and his mood was stable but his affect was blunt. *Id*. His insight and judgment were determined to be poor due to his cognitive impairment. *Id*.

December 18, 2010 notes from Turning Point indicate that Plaintiff had a logical thought process, but his mood was mildly dysthymic with a constricted affect, impaired cognition and impaired insight and judgment, although Plaintiff did deny hallucinations. Tr. at 329.

Progress notes from Turning Point dated February 2, 2011 indicate that Plaintiff was still waiting for his social security benefits determination and he was compliant with his medications. Tr. at 327. His thought process was logical, his mood was stable, with a blunted affect, and he had reported no side effects from his medications. *Id*. at 327-328.

On March 30, 2011, Dr. Guttikonda of Turning Point met with Plaintiff and noted that his hygiene was somewhat poor. Tr. at 341. Plaintiff indicated that he was talking to himself and arguing with himself. *Id*. His thought process was found logical, he had delusional ideas and occasional hallucinations, with a blunted affect and relatively stable mood. *Id*.

On March 30, 2011, Dr. Guttikonda completed a form entitled "Medical Statement Concerning Depression with Anxiety, OCD, PTSD, or Panic Disorder." Tr. at 344. Dr. Guttikonda checked only one of the eighteen signs and symptoms listed on the sheet that Plaintiff exhibited, that of mild vigilance and scanning. Tr. at 345. The form defined the terms "mild," "moderate," "marked," and "extreme." *Id*. With these terms, Dr. Guttikonda opined that Plaintiff's mental

impairments caused mild limitations in Plaintiff's activities of daily living and moderate difficulties in maintaining social functioning.  *Id*.  He found that Plaintiff had deficiencies of concentration, persistence or pace present which resulted in his frequent failure to complete tasks in a timely manner.  *Id*.

Dr. Guttikonda opined that Plaintiff had no limitation in remembering locations and work-like procedures, but mild limitations in the abilities to: carry out very short and simple instructions, make simple work-related decisions, and to ask simple questions or request assistance.  Tr. at 346.  He further found that Plaintiff had moderate restrictions in his abilities to: understand and remember short and simple instructions; sustain an ordinary routine without special supervision, interact appropriately with the general public, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, and to travel in unfamiliar places and use public transportation.  *Id*.  He further opined that Plaintiff was extremely limited in the following areas: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance and being punctual; working in coordination and in proximity to others without being distracted by them; completing a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness.  *Id*.

Dr. Guttikonda handwrote a statement that in his opinion, Plaintiff was disabled from all sustained employment.  Tr. at 346.

On the same date, Dr. Guttikonda also completed another medical statement, this one captioned "Medical Statement Concerning Schizophrenia- Adult."  Tr. at 347.  He noted that he began treating Plaintiff on March 13, 2008 and his last visit with Plaintiff was on March 30, 2011.  *Id*.  He checked that Plaintiff had either "intermittent or persistent" delusions or hallucinations and emotional withdrawal and/or isolation.  *Id*.  The form defined "none," "mild," "moderate," "marked,"

-9-

and "extreme," and Dr. Guttikonda found that Plaintiff's impairment mildly restricted his activities of daily living and presented marked difficulty in his ability to maintain social functioning. *Id.* He noted that Plaintiff had deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner, Plaintiff had no repeated episodes of deterioration or decompensation, and he had a documented history of two or more years of an inability to function outside of a highly supportive living situation. *Id.* Dr. Guttikonda circled "moderately impaired" for all of the identified work limitations, including the abilities to: remember locations and work-like procedures; understand, remember and carry out short and simple instructions; understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintaining regular attendance and being punctual; sustain an ordinary routine without special supervision, work in coordination and in proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places and use public transportation; and set realistic goals or make plans independently of others. *Id.* at 347-348. Dr. Guttikonda also found that Plaintiff was incapable of even "low stress" jobs. *Id.* at 348.

### B.    TESTIMONIAL EVIDENCE

At the hearing, Plaintiff testified that he completed the tenth grade and was in special education classes for all of his classes. Tr. at 33. He indicated that he had a driver's license and he drove once a day to take his girlfriend to work and to pick her up. *Id.* He related that he last worked in 2006 and had that job for four and a half years until his boss laid him off because the company had a lot of debt. *Id.* at 34. He tried temporary services but they had difficulty placing him because he could not do math or read tape measures and when he was placed, it lasted only a short time because he did not understand the work or was not fast enough to perform the work. *Id.*

-10-

He explained that he got into a fight in high school and was suspended and did not return and was unable to get a GED because he could not pass the test to get into an adult education program. Tr. at 34.  He also related that he got a domestic violence charge in 1998 when he put his hand around his girlfriend's throat and she called the police. *Id.* at 35.  He was put in the back of the squad car and kicked out the back window. *Id.*  He also recalled that two months after that incident, he hit his sister in the back of the head after she threw hot dog sauce on him. *Id*.  He was put on probation. *Id.*

Plaintiff testified that he has been with his current girlfriend for the past twelve years and while they argued, the anger management classes that he had to take after he got out of jail helped him. Tr. at 36.  He indicated that he drove her to work because he stayed up all night and slept all day. *Id*. at 37.

When asked about his depression, Plaintiff indicated that sometimes he felt worthless and he just wanted to take a car and drive off of a cliff.  Tr. at 37.  He said that he thought about that for a good while, but the Lexapro and Abilify medications were slowly taking that thought away. *Id*.

When asked about his headaches, Plaintiff explained that the first time he went to the emergency room, he was told that it was muscle contractions and he was prescribed medication.  Tr. at 38.  He stated that the second time he went to the emergency room, he was told he had a sinus blockage, but he was unable to keep seeing the doctor they recommended due to financial difficulties. *Id*.  He related that he has to put his head under a blanket in complete darkness when the headaches occurred and he gets the headaches on certain months three to five times per month and they last all day. *Id.*  He indicated that he has Excedrin for the headaches, which does not seem to help. *Id.*

Plaintiff testified that he has lived with his parents all of his life, watched television all night, and slept all day except for Saturdays and Sundays when he took his girlfriend to work and picked her up from work.  Tr. at 39.  He wakes up at four to five o'clock in the evening, gets something to eat, goes back into his room and watches television. *Id.*  He related that his mother does all of the cleaning and laundry, and he sees his girlfriend one hour or so per day. *Id*. at 40.  He stated that he had one friend that he talks to or sees once or twice per month and they work on cars. *Id.* at 41.

Plaintiff indicated that he could not rent his own place because he was not capable or paying bills and he does not grocery shop because he cannot write or read that well.  *Id*.  He indicated that he was held back in the third grade three times and he cannot read a newspaper, but looks at car ads.  *Id*. at 42.  He made it to the tenth grade with Ds and Fs and it took him five times to pass the written portion of the driving test.  *Id*. at 43.

Plaintiff also noted that he once put his fist through the windshield of his car.  Tr. at 44.  He also tried to rip the door off of a car when the motor blew up.  *Id*.  He reported that he does not hear voices much anymore and had visual hallucinations a while ago.  *Id.* at 45.  He reported that he showered and changed his clothes once a week.  *Id.*

**VI.**  **LAW AND ANALYSIS**

    **A.**  **HEADACHES AND INTERMITTENT EXPLOSIVE DISORDER**

Plaintiff first complains that the ALJ erred at Steps Two, Three, Four and Five when she ignored Plaintiff's headaches and Intermittent Explosive Disorder, making no findings as to these conditions.  ECF Dkt. #18 at 13.

At Step Two, the ALJ determines whether a claimant's impairments are severe and whether they meet the twelve-month durational requirement.  20 C.F.R. § 404.1520(c). At this Step, the claimant bears the burden of proving the threshold requirement of a "severe impairment." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).  The claimant must also show that he suffered from a medically severe impairment or impairments that lasted or could be expected to last for a continuous period of at least twelve months.  *Id.*  The Court must apply a de minimis standard in determining severity at Step Two.  *Id.* at 862.  An impairment or combination of impairments is not severe  "...if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).  The types of "basic work activities" that qualify for use in the regulations are described in 20 C.F.R. § 404.1521(b).  An impairment can be found non-severe only if it could constitute "a slight abnormality which has such a minimal effect on the individual that it could not be expected to interfere with an individual's ability to work, irrespective of age, education and past work experience." *Farris v. Sec'y of Health and Human Servs*., 773 F.2d 85, 89-90 (6th Cir. 1985). The goal of Step Two is to screen out totally groundless claims.  *Id.* at 89.  Further, an ALJ's failure

-12-

to label a condition as a severe impairment at Step Two is not reversible error when the ALJ determines that the claimant has at least one other severe impairment and continues to evaluate both the severe and non-severe impairments in the remaining steps to determine entitlement to DIB and SSI.  *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

In this case, Plaintiff is correct that the ALJ did not identify his headaches or intermittent explosive disorder as severe impairments under Step Two.  ECF Dkt. #13 at 15.  However, the hearing testimony and the ALJ's decision show that she considered these conditions.  At the hearing, the ALJ asked Plaintiff about his headaches, and he explained his emergency room visits when the first doctor told him that his muscles were contracting and the second doctor told him a sinus blockage was causing his headaches.  Tr. at 38.  Plaintiff related that he did not have the money to treat the blockage.  *Id.*  He then testified that he had been getting headaches "off and on" and had to put his head under a blanket and completely darken a room when he does get them.  *Id*.  He related that some months he gets no headaches and other months he has three to five headaches that last the whole day.  *Id*.

The ALJ also asked Plaintiff if he often got into fights, and he related that he had not been in a fight for awhile.  Tr. at 34.  He explained that he had last gotten into a fight in high school in 1998 for which he was suspended, and then shortly thereafter he put his hand around his girlfriend's neck and kicked out the back window of a police car when he was arrested for domestic violence, and then he also hit his sister in the back after she threw hotdog sauce on him.  *Id.* at 34-35.  He related that he has been with his current girlfriend for twelve years and although they have arguments often, the anger management classes that he had to take after he got out of jail on the domestic violence helped him to deal with his anger and taught him to leave the scene when people are arguing.  *Id.* at 35-36.  The office treatment records from Turning Point confirmed that Plaintiff participated in the anger management classes associated with his legal troubles in 1998.  *Id*. at 256.

The medical evidence and Plaintiff's testimony concerning his headaches fail to establish the durational requirements of a severe impairment for Step Two purposes.  Plaintiff presented to the emergency room on April 30, 2009 complaining of headaches "off and on" for the last one and one-half weeks.  Tr. at 311.  There was no nausea or vomiting, but Plaintiff did have neck pain.  *Id.* at

311-312, 314.  He was prescribed Motrin 600 mg and released with a "headache" diagnosis. *Id.* at 313.  On January 17, 2010, the emergency room diagnosed Plaintiff with "cephalgia" or headache when he presented there complaining that he had "headache[s] off and on for few months," with no accompanying nausea, vision loss or congestion. *Id.* at 302.  It was also noted that Plaintiff reported having headaches the year prior and they went away after a few months. *Id.*  Plaintiff's head CT scan showed no brain abnormalities, but a "prominent opacified bilateral maxillary sinuses." *Id.* at 306.  The only other medical evidence concerning Plaintiff's headaches shows that he was prescribed Excedrin Sinus Headache medicine, one every eight hours as needed for his headaches. *Id.* at 317, 321.  This evidence fails to satisfy the durational requirement because no evidence shows that they "lasted or could be expected to last for a continuous period of at least twelve months" since they occurred "off and on" over a few months per year.   Further, this evidence fails to establish that Plaintiff's headaches significantly limited his ability to perform basic work activities.

Moreover, the medical evidence and Plaintiff's testimony fail to establish that his intermittent explosive disorder was a severe impairment. Only one note in the record even mentions a diagnosis of intermittent explosive disorder.  That record is an intake evaluation by a licensed social worker at Turning Point.  Tr. at 265-266.  However, a second assessment on that same day did not include it as a diagnosis. *Id.* at 202.  Moreover, Dr. Guttikonda did not diagnose Plaintiff with intermittent explosive disorder when he assessed Plaintiff or provided medical statements.  *Id.* at 340-348.  Plaintiff testified that he had anger issues during his high school years and shortly thereafter and he had to take anger management classes as a result, which he testified seemed to help him.  *Id.* at 36.  None of the mental health records show that Plaintiff's history or anger problems would significantly limit his ability to perform basic work activities.

For these reasons, the Court finds that the ALJ did not commit error in finding that Plaintiff's headaches and intermittent explosive disorder were not severe impairments at Step Two.

In addition, even if the ALJ erred in not finding these two conditions to be severe impairments, this does not constitute reversible error if she determined that Plaintiff had at least one other impairment at Step Two and continued to evaluate Plaintiff's severe and non-severe impairments under the remaining steps of the evaluation process. *Maziarz*, 837 F.2d at 244.  The

ALJ here found that Plaintiff's other conditions of depressive disorder not otherwise specified, dysthymic disorder, BIF, and personality disorder were severe impairments at Step Two. Tr. at 15. She then proceeded to consider Plaintiff's anger problems in her RFC as she noted in her decision that Plaintiff alleged that he was quick to anger and limited his RFC accordingly to no more than limited and superficial interaction with supervisors, co-workers and the general public, no team work or group projects, and low stress tasks. *Id*. at 18-19.

For these reasons, the Court finds no merit to Plaintiff's claim that the ALJ committed reversible error in determining that Plaintiff's headaches and intermittent explosive disorder were not severe impairments.

### B.     TREATING PHYSICIAN'S OPINIONS

Plaintiff also asserts that the ALJ committed error in the weight that she attributed to the opinions of his treating psychiatrist, Dr. Guttikonda, because her proffered reasons for doing so were inaccurate and not supported by substantial evidence. ECF Dkt. #18 at 14-18. The ALJ attributed "no weight" to Dr. Guttikonda's March 30, 2011 "Medical Statement Concerning Depression with Anxiety, OCD, PTSD, or Panic Disorder" ("Depression Medical Statement"). Tr. at 20. She also accorded "little weight" to Dr. Guttikonda's second March 30, 2011 "Medical Statement Concerning Schizophrenia-Adult" ("Schizophrenia Medical Statement"). *Id*. at 21. The Court finds that the ALJ's stated reasons for rejecting Dr. Guttikonda's Depression Medical Statement failed to meet the good reasons requirement, but this error was harmless because the ALJ indirectly attacked the supportability of those opinions and their consistency with other record evidence. The Court further finds that the ALJ adequately accommodated Dr. Guttikonda's Schizophrenia medical statement and provided a good reason for rejecting his opinion that Plaintiff could not tolerate even low stress jobs.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). If  that presumption is not

rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, she must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, she must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.'" *Wilson v. Commisioner of Social Security,* 378 F.3d 541, 544 (6th Cir.2004) quoting *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why she rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Commisioner of Social Security,* 486 F.3d 234, 243 (6th Cir.2007), citing *Wilson,* 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed

-16-

controlling. *Id.* citing  20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

In *Gayheart*, the Sixth Circuit recognized that conflicting substantial evidence must consist of "more than the medical opinions of the nontreating and nonexamining doctors." The Sixth Circuit reasoned that "[o]therwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion." *Gayheart* at 377. However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985).

In the instant case, the Court questions many of the ALJ's reasons for her treatment of Dr. Guttikonda's Depression medical statement.  The ALJ first explained that she attributed no weight to this opinion because it was "internally inconsistent."  Tr. at 20.  She explained that Dr. Guttikonda remarked on one of his progress notes that Plaintiff's hygiene "remains poor" even though no previous references to Plaintiff's hygiene were mentioned in his notes.  *Id.*, citing Tr. at 341.  The Court notes that there was one prior reference to Plaintiff's hygiene when Dr. Guttikonda described his appearance as "unkempt" on May 14, 2008.  *Id.* at 216, 271.  However, even if there were no prior references, Dr. Guttikonda's statement that Plaintiff's hygiene "remains poor" without any prior statement concerning hygiene is not an "internal inconsistency" and does not meet the "good reasons" requirement for rejecting Dr. Guttikonda's opinion.

The ALJ also explained that she rejected the Depression Medical Statement because Dr. Guttikonda treated Plaintiff no more than four times per year.  Tr. at 20.  She referred to an agency worker's report of contact with Plaintiff on September 8, 2009 in which he stated that he no longer attended counseling and he treated with Dr. Guttikonda once every three months and with Dr. Guttikonda's nurse once every two months.  *Id.* at 157.  The case records confirm that Dr. Guttikonda treated Plaintiff five times in 2008, four times in 2009, and at least once in 2010.  *Id.* at 275-293.  However, the ALJ labeled Dr. Guttikonda a treating psychiatrist in her decision.  *Id.* at 20.  Further, "merely taking note of the number of visits by itself is not enough to show either that the contacts

-17-

are sufficient to establish a treating relationship or that conclusively they are not." *Montanez v. Comm'r of Soc. Sec.*, No. 1:13CV614, 2013 WL 6903764, at *8 (N.D. Ohio, Dec. 31, 2013), citing *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1035 ( 9th Cir. 2003).  The social security regulations provide that a treating source is an acceptable medical source who has or had "an ongoing treatment relationship" with the claimant, which is shown when the claimant has seen the source "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition." 20 C.F.R. §§ 404.1502, 416.902.  Courts have noted that with regard to psychological or psychiatric impairments, the accepted medical practice is "that a psychiatrist may prescribe and manage medications while not seeing a patient with any regularity, instead basing the treatment on routinely receiving reports and evaluations from others who provide the 'hands-on' interaction with the patient." *Montanez*, 2013 WL 6903764, at *8, citing *Benton*, 331 F.3d at 1035.

The ALJ also afforded no weight to Dr. Guttikonda's handwritten notation on the bottom of the Depression medical statement that he believed that Plaintiff was disabled from engaging in any sustained employment. Tr. at 20.  She explained that the determination of whether a claimant is disabled is the decision of the ALJ.  The Court agrees that this is a valid reason.  Sections 404.1527(d)(1) and 416.927(d)(1) of Title 20 of the Code of Federal Regulations provide that a medical source opinion that a claimant is disabled is an issue reserved for the determination of the ALJ or Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).  Sections 404.1527(d)(3) and 416.927(d)(3) of Title 20 explain that no special significance is given to a source's opinion on issues reserved to the Commissioner, which includes those opinions concerning whether a claimant is disabled. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).  Accordingly, the ALJ correctly afforded no weight to this part of Dr. Guttikonda's Depression medical statement.

As her final reason for attributing no weight to Dr. Guttikonda's Depression medical statement, the ALJ found that the opinion "is not supported by the evidence or record, nor is it consistent with other opinions of record, such as that set forth by the consultative examiner, Stanley J. Palumbo, Ph.D." Tr. at 20.  This conclusory statement without further explanation does not

-18-

constitute a "good reason" for the ALJ's determination to devalue Dr. Guttikonda's medical statement.

Since the ALJ's stated reasons for rejecting Dr. Guttikonda's Depression medical statment are conclusory and unsupported, the Court finds that the ALJ has failed to provide good reasons on the record for rejecting that statement.  When an ALJ fails to provide good reasons on the record for rejecting a treating physician's opinion, a court must reverse and remand "unless the error is a harmless de minimis procedural violation." *Blakely*, 581 F.3d at 409 (citing *Wilson,* 378 F.3d at 547. The ALJ's failure to give good reasons for affording less than controlling weight to a treating physician's opinion can be deemed harmless error if: "(1) the treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of § 1527(d) (2) ... even though she has not complied with the terms of the regulation." *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir.2011) (internal citations and quotation marks omitted).

In the instant case, the Court finds that the ALJ met the goal of the regulation when she indirectly attacked the severe limitations opined in Dr. Guttikonda's Depression medical statement in other parts of her decision.  In *Hall v. Commissioner of Social Security,* 148 Fed. App'x 456, 464 (6th Cir.2005), the Sixth Circuit elaborated on the last instance of finding harmless error, explaining as follows:

> As applied to this case, the ALJ could have met the goal of providing good reasons [for dismissing the medical opinion of the treating physician regarding the claimant's back ailment] by either his analysis of Dr. Caudill's other opinions or his analysis of [claimant's] back problems in general. Such analyses would perhaps adequately address Dr. Caudill's opinion about [claimant's] back pain by indirectly attacking the 'supportability' of the doctor's opinion, § 404.1527(d)(3), or the 'consistency' of his opinion with the record as a whole, § 404.1527(d)(4), both of which are grounds for rejecting a treating source opinion.

*Id*. at 470.  The Sixth Circuit thereafter applied the indirect attack rule in *Nelson v. Commissioner of Social Security*, 195 Fed. App'x 456, 464 (6th Cir. 2005).  In that case, the ALJ failed to provide an explanation of the weight given to a treating psychiatrist's opinion, among other opinions, even though the psychiatrist had provided reports and completed disability questionnaires describing the

claimant's limitations.  *Id*. at 468.  The Sixth Circuit quoted *Hall* and the harmless error rule and found that:

> the ALJ's analysis of Nelson's mental problems adequately addressed [the treating sources'] opinions by indirectly attacking both the consistency of those opinions with the other record evidence and their supportability. The ALJ implicitly provided sufficient reasons for not giving those opinions controlling weight, and indeed for giving them little or no weight overall. The ALJ thus met the goal of § 1527(d)(2)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation.

*Id*. at 472 (internal citation and quotation marks omitted).

Similarly in the instant case, the Court finds that the ALJ adequately addressed Dr. Guttikonda's Depression medical statement by indirectly attacking the consistency of Dr. Guttikonda's opinion with other evidence in the record.  Elsewhere in her decision, the ALJ cited to Dr. Guttikonda's treatment notes from Turning Point which showed that a great deal of Plaintiff's mental status examinations were relatively normal, with numerous findings of a logical thought process and stable mood.  Tr. at 19, citing Tr. at 274, 327, 331.  She also noted Plaintiff's hearing testimony that the medications he took eliminated his hallucinations and he had no side effects from them.  Tr. at 19, citing Tr. at 44.  She also cited to one of the agency examining psychologist's findings that Plaintiff may be malingering.  Tr. at 19, citing Tr. at 227.  She also partially discounted Plaintiff's credibility, finding that his reason for filing for social security disability benefits was not entirely motivated by the severe limitations caused by his impairments, but rather by the fact that he was laid off from employment after four years and from his own obstinance in looking for work.  *Id*.  She cited to treatment notes where Plaintiff became angry when his attorney told him to look for work because he had planned to "sit and lay in his room."  *Id*. at 19, citing Tr. at 280.  She also cited to treatment notes by Plaintiff's psychotherapist who reported that Plaintiff expected jobs to come to him and he had an excuse for everything he did not do.  *Id*. at 19, citing Tr. at 286.  The ALJ also noted that Plaintiff was able to work at the same job for over four years despite the same impairments with no evidence that the impairments had worsened and no evidence that Plaintiff would have stopped working for any reason other than the fact that he was laid off from that job.  Tr. at 19, 33-34.  The ALJ also cited to the facts that Plaintiff was able to keep a long-term, twelve-year

relationship with his girlfriend, he could leave his home independently, and he was able to drive a car in order to take his girlfriend to work and pick her up from work each day.  Tr. at 19, citing Tr. at 33.

Accordingly, the Court finds that the ALJ's decision adequately addressed Dr. Guttikonda's Depression medical statement by indirectly attacking its consistency and support with her analysis of the other evidence in the record.

As to Dr. Guttikonda's Schizophrenia medical statement, the Court finds that the ALJ adequately accommodated his opinion that Plaintiff was moderately limited in nearly every area as she provided in her mental RFC for Plaintiff that he was limited to simple, routine, repetitive tasks which could be learned in thirty days or less, no high production quotas or strict time requirements, no arbitration, negotiation or confrontation, no directing the work or being responsible for the safety of others, no jobs requiring him to read or write, no jobs requiring more than limited and superficial interaction with supervisors, co-workers and the general public, and no jobs requiring team work or group projects.  *Compare* Tr. at 20 with Tr. at 348. As to Dr. Guttikonda's opinion that Plaintiff was incapable of even "low stress" jobs due to his impairment, the ALJ reasoned that this opinion did not take into account the fact that Plaintiff had worked in a low stress job for four years and left that job only because he was laid off and not because of his impairments.  Tr. at 21.  The Court finds that this is a valid reason for attributing little weight to this medical statement as Plaintiff did testify that he had a job for four and a half years and stopped working there because he was laid off due to the company getting into a lot of debt, not because of his impairments or inability to handle the stress of the job.  *Id*. at 34.

Accordingly, the Court finds that the ALJ's indirect attack of Dr. Guttikonda's Depression medical statement with other evidence in the record rendered harmless her error in failing to adequately explain her reason for rejecting Dr. Guttikonda's Depression medical statement.  The Court further finds that the ALJ provided a good reason for rejecting Dr. Guttikonda's handwritten note regarding disability and she adequately accommodated his Schizophrenia medical statement in her decision.  The ALJ also provided a good reason for rejecting Dr. Guttikonda's opinion that Plaintiff could not perform even low stress work.

-21-

### C.     *RES JUDICATA* AND STEPS FOUR AND FIVE

Plaintiff lastly asserts that the ALJ erred when she found at Step Four that he could return to his past relevant work.  ECF Dkt. #18 at 18.  He contends that the current ALJ was bound by the ALJ's decision in his prior case who found that he could not return to his past relevant work  *Id*.  Plaintiff cites to the principles of res judicata outlined in *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997), in support.  ECF Dkt. #18 at 18.  Defendant asserts that the current ALJ did not commit error at Step Four and reversal and remand is not necessary in this case because the current ALJ proceeded to Step Five and found that Plaintiff could perform a significant number of jobs in the national economy.  ECF Dkt. #19 at 14-15.

In *Drummond*, the Sixth Circuit Court of Appeals held that "[a]bsent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ."  126 F.3d at 842.  The Court held that the burden is on the Commissioner to prove a change in circumstances in order to escape the bar of res judicata.  *Id.* at 843.

The Court points out that the current ALJ indicated that her decision was decided under *Drummond* and she concluded that she was not bound by the prior ALJ's decision because of new and material evidence that was presented.  Tr. at 13.  Although she did not identify it as such, the current ALJ cited to the treatment notes at Turning Point which began with Plaintiff's initial diagnostic assessment on March 13, 2008 by two social workers and an assessment and treatment notes thereafter provided by Dr. Guttikonda.  *Id.* at 201-218.  The opinions of Dr. Guttikonda were also cited, as well as Plaintiff's hearing testimony, and the assessments of agency examining psychologist Dr. Palumbo, and agency reviewing psychologists Drs. Meyer and Tangerman.  *Id.* at 19-21.  The current ALJ added the severe impairments of dysthymic disorder and personality disorder to the prior ALJ's severe impairments of depression and BIF, but she also cited to the many Turning Point treatment notes indicating stable mental examination findings with logical thought processes. *Id.*  She also cited to Plaintiff's decision to stop counseling, his testimony that it was a layoff from his job of over four years that was the reason that he stopped working, and no showing that his conditions had worsened since that layoff from employment.  *Id.* at 19.  Since the current

-22-

ALJ presented new and material evidence that Plaintiff's conditions had improved, she was not bound by the prior ALJ's determinations.

Moreover, even if the current ALJ had erred at Step Four by finding that Plaintiff could return to his past relevant work, the Court finds such an error harmless and remand of the case is futile since the current ALJ proceeded onward to Step Five of the analysis to determine that Plaintiff could perform a significant number of jobs occurring in the national economy.  Tr. at 22-23; *see Stull v. Astrue*, No. 3:10-CV-693, 2011 WL 830633, at *6 (N.D. Ohio Jan. 18, 2011)(ALJ's Step Four finding not supported by substantial evidence but harmless error found since ALJ performed a Step Five analysis), citing *e.g. Tommasetti v. Astrue*, 533 F.3d 1035, 1042 (9th Cir. 2008, accord *Cadena v. Astrue*, 365 Fed. Appx. 777, 780 (9th Cir. 2010); *cf. Wilson*, 378 F.3d at 547 (court will not remand case when doing so is idle and useless formality).   The ALJ relied upon the testimony of the VE presented at the hearing to determine that Plaintiff, with the RFC advanced by the ALJ, could perform the representative jobs of dining room attendant, laundry worker, and cook helper, which exist in significant numbers in the national economy.  *Id.*  Plaintiff does not claim any error with the ALJ's Step Five findings.

**VII.   CONCLUSION**

For the foregoing reasons, the Commissioner's decision is AFFIRMED and Plaintiff's complaint is DISMISSED with prejudice.

DATE: April 8, 2014

                 ___*/s/George J. Limbert*_____
                 GEORGE J. LIMBERT
                 UNITED STATES MAGISTRATE JUDGE